**DOCKETED**

**AUG 1 1** 2003

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

LIBERTY INSURANCE
UNDERWRITERS, INC.,

           Plaintiff,

    v.

ROBERT S. ROSS and THE
STERLING TRUST COMPANY,

           Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

JUDGE RONALD GUZMAN

# 03C 5531

No.

MAGISTRATE JUDGE NOLAN

03 AUG -8 PM 1:30
CLERK
U.S. DISTRICT COURT
FILED-EDA



### COMPLAINT FOR DECLARATORY JUDGMENT

Now comes the Plaintiff, Liberty Insurance Underwriters, Inc. ("Liberty"), by its attorneys, Neal, Gerber & Eisenberg LLP as and for its Complaint for Declaratory Judgment pursuant to 28 U.S.C. §§ 2201 and 2202 against the Defendants, Robert S. Ross ("Ross") and The Sterling Trust Company (the "Sterling Trust"), and alleges as follows:

### Statement of the Case

1.    This is an action for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 brought for the purpose of determining questions of actual controversy between the parties. For the reasons set forth herein, Liberty seeks a declaration that it has no duty or obligation to defend and indemnify Ross under a Professional Liability Insurance Policy in connection with any claims set forth in an Arbitration Complaint filed by the Sterling Trust against, among others, Ross (the "Underlying Action").

2.    Liberty seeks a declaration that it has no duty or obligation to defend and indemnify Ross in the Underlying Action on the grounds that the Liberty Policy only provides

coverage for claims arising out of an act, error or omission in connection with the rendering or failure to render "professional legal services" as defined in the Liberty Policy. Here, the claims against Ross in the Underlying Action do not arise from the rendering or the failure to render "professional legal services" and, as such, the Liberty Policy provides no coverage. Additionally, several exclusions in the Liberty Policy preclude coverage for the claims in the Underlying Action in any event.

## The Parties

3.     Plaintiff Liberty is an insurance company organized and existing under the laws of the State of New York with its principal place of business in the State of New York.

4.     Defendant Ross is an attorney with his principal place of business located in Chicago, Illinois.

5.     Defendant Sterling Trust is a non-bank trust company chartered under the laws of the State of Texas with its principal place of business in Waco, Texas. Sterling Trust is the plaintiff in the Underlying Action against Ross and others, all of which will be more fully explained below.

## Jurisdiction and Venue

6.     This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(1) and (c)(1) as complete diversity of the parties exists and the amount in controversy exceeds the sum or value of $75,000 exclusive of interest and costs.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(2) as Ross is an attorney with his principal place of business in Chicago and as such, a substantial part of the events or omissions giving rise to this dispute occurred in this District.

- 2 -

### The Liberty Policy

8.     On or about March 1, 2003, Liberty issued a Lawyers Professional Liability Insurance Policy to Ross as the named insured under Policy No. LPJ093587-0103 for the effective policy period of March 1, 2003 to March 1, 2004 (the "Liberty Policy"). The Liberty Policy provides primary professional liability insurance to Ross on a "claims-made" basis with limits of liability of $1,000,000 per claim and $1,000,000 in the aggregate, inclusive of claims expenses and subject to a $10,000 deductible per claim. A true and correct copy of the Liberty Policy is attached hereto as Exhibit A.

9.     The Insuring Agreement of the Liberty Policy provides, in pertinent part, as follows:

> **Coverage**
>
> **We** agree with the **named insured** that in consideration of the premium paid, **your** obligation to pay the deductible, and in reliance upon the statements made by the **named insured** in the application, the Declarations, and supplementary information provided by the **named insured**, and subject to the limits of liability as stated in the Declarations, and the exclusions and all other terms and conditions of the policy, as follows:
>
> **We** agree to pay on **your** behalf all **damages** in excess of the deductible amount and up to the limits of liability stated in the Declarations that you become legally obligated to pay, provided such **damages**:
>
>     1.   result from **claims**
>
>         a.   first made against you during the **policy period** or any extended reporting period, if applicable, and
>
>         b.   reported to **us** in writing; and
>
>     2.   are caused by a **wrongful act** which takes place before or during the **policy period** but not before the Retroactive Date set forth in the Declarations, if any.

10.     The Liberty Policy defines the term "damages," in pertinent part, as follows:

> **damages** means a monetary judgment or settlement, but does not include fines or statutory penalties, sanctions whether imposed by law or

otherwise, any other amount awarded in any **disciplinary proceeding**, the return of or restitution of legal fees, costs and expenses, punitive or exemplary damages, the multiplied portion of multiplied **damages**, amounts for which **you** are not financially liable or which are without legal recourse to **you** or matters which may be deemed uninsurable under applicable law.

11.     The Liberty Policy defines the term "wrongful act" as follows:

    **wrongful act** means any actual or alleged act, error, omission or **personal injury** which arises out of the rendering or failure to render **professional legal services**.

12.     The term "professional legal services" is defined, in pertinent part, as follows:

    **professional legal services** means legal services and activities performed for others as:

    a.     a lawyer;

    b.     a notary public;

    c.     an arbitrator;

    d.     a mediator;

    e.     a title insurance agent;

    f.     a designated issuing lawyer to a title insurance company;

    g.     a court-appointed fiduciary;

    h.     a member of a bar association, ethics, peer review, formal accreditation or licensing, or similar professional board or committee;

    i.     an author, strictly in the publication or presentation of research papers or similar materials and only if the fees generated from such work are not greater than ten thousand dollars ($10,000); and/or

    j.     an administrator, conservator, receiver, executor, guardian, or any similar fiduciary capacity, or court-appointed trustee, however, no coverage shall apply to any loss sustained by you as the beneficiary or distributee of any trust or estate.

Services performed by **you** in a lawyer-client relationship on behalf of one or more clients shall be deemed for the purpose of this section to be professional services in **your** capacity as a lawyer, although such services could be performed wholly or in part by nonlawyers.

13.     The Liberty Policy also contains exclusions from coverage with respect to "Known Claims or Circumstances" and "Certain Services and Capacities" of the Insured which provide, in pertinent part, as follows:

### Exclusions

1.      **Known Claims or Circumstances.**  This policy does not apply to any **claim** arising out of a **wrongful act** occurring prior to the **policy period** if, prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by use to the **named insured** and continuously renewed and maintained in effect to the inception of this **policy period**:

   a.      **you** gave notice to any prior insurer of any such **claim or wrongful act**;

   b.      **you** had a reasonable basis to believe that **you** had breached a professional duty, committed a **wrongful act**, violated a disciplinary rule, engaged in professional misconduct or to foresee that a **claim** would be made against **you**; or

   c.      there is a prior policy or policies which provide insurance for such **wrongful act** or **claim**, unless the available limits of liability of such prior policy or policies are insufficient to pay any liability or **claim**, in which event this policy will be excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

                                  *        *        *

3.      **Certain Services and Capacities.**  This policy does not apply to any **claim** arising out of **your** services and/or capacity as:

   a.      an officer, director, partner, trustee, manager, operator, or employee of an **organization** other than that of the **named insured**, except this exclusion does not apply to a court-appointed trustee;

14.     The Liberty Policy defines the term "organization" as follows:

   **organization** means a corporation, partnership, association, trust or fund, (including a pension, welfare, profit sharing, mutual or investment fund or trust) or any other business enterprise or charitable organization of any kind or nature.

15.     The Liberty Policy was endorsed to include a Part-Time Attorney Endorsement which provides, in pertinent part, as follows:

**THIS ENDORSEMENT AMENDS THE POLICY.  PLEASE READ IT CAREFULLY.**

**PART-TIME ATTORNEY ENDORSEMENT-ILLINOIS**

This endorsement modifies insurance provided under the following:

**ILLINOIS LAWYERS PROFESSIONAL LIABILITY POLICY**

In consideration of the premium charged, it is hereby agreed and understood that:

1.      The definition of the term "you" contained in the policy is hereby deleted in its entirety and is replaced with the following:

"**you**" means:

    a.      the **named insured**;

    b.      any non-lawyer who is an employee of the **named insured**, solely while acting within the scope of such person's duties as an employee; and

    c.      the estate, heirs, executors, administrators, assigns and legal representatives of each of **you** in the event of **your** death, incapacity, insolvency or bankruptcy, but only to the extent that **you** would otherwise be provided coverage under this policy.

2.      Exclusion 6 is deleted is its entirety and is replaced with the following:

6. Equity Interests.

This policy provides no coverage for any **claim** based upon or arising out of **professional legal services** performed by **you** for any **organization** in which **you**, individually or collectively, own or owned any of the issued and outstanding shares, units or other portions of the **organization**.

**All other terms and conditions of the policy remain unchanged.**

**The Underlying Action**

16.     The Sterling Trust filed the Arbitration Complaint in the Underlying Action on or about May 23, 2003.  A true and correct copy of the Arbitration Complaint in the Underlying Action is attached hereto as Exhibit B.

17.     In the Underlying Action, the Sterling Trust asserts causes of action against respondents Ross, Robert Goldfine ("Goldfine"), Bruce Block ("Block"), RBG National, Inc., RBG Financial, Inc., RBG Management Services, Inc., RBG Investments, Inc., (the "RBG Entities") and various other parties. The Sterling Trust alleges that Ross, Goldfine and Block are principals and executive officers of the RBG Entities.

18.     The Sterling Trust alleges that throughout the 1990's, the RBG Entities issued fifteen limited partnerships in which numerous claimants invested approximately $20,000,000 through the purchase of promissory notes in units of $25,000. The limited partnerships allegedly invested this money in residential and commercial real estate developments throughout the country.

19.     The Sterling Trust alleges that some of the limited partnerships began returning money to the claimants pursuant to governing private placement memoranda, but that most of the limited partnerships were either not making required periodic payments, or were sporadically making payments, notwithstanding the fact that the real estate developments underlying the limited partnerships had allegedly been successfully completed.

20.     The Sterling Trust alleges that numerous written and telephonic requests for updates from the principals of the RBG Entities were not responded to and that the RBG Entities improperly diverted funds from the claimants and have, instead, invested the diverted funds in unrelated "pet projects" of the principals of the RBG Entities.

21.     The Sterling Trust alleges that the respondents, including Ross, failed to establish, implement and enforce adequate supervisory procedures in connection with the limited partnerships, as well as the investments and that the failure to establish such procedures caused the claimants' alleged damages.

22. Specifically, the Sterling Trust alleges that Ross and the other respondents breached their fiduciary duties as principals and defrauded the claimants. The Sterling Trust alleges that Ross and the other respondents failed to execute their contractual duties to establish, implement and enforce adequate supervisory procedures to prevent misconduct, failed to intervene to prevent the alleged misconduct and failed to implement appropriate remedial measures after discovering the alleged misconduct.

23. The Sterling Trust alleges that Ross and the other respondents made misrepresentations and/or omissions of material facts concerning the status of the limited partnerships, as well as the investments, and that the claimants justifiably relied on these misrepresentations and/or omissions.

24. Based on these allegations, the Sterling Trust has asserted fourteen causes of action against Ross and the other respondents, including: (1) violations of federal and state securities laws; (2) violations of the Texas Deceptive Trade Practices Act; (3) violations of the Texas Business & Commerce Code; (4) Negligence, gross negligence, breach of industry standards; (5) breach of implied and express contract; (6) breach of fiduciary duty, duty of care and duty of loyalty; (7) common law fraud; (8) *respondeat superior*; (9) controlling person liability (10) aiding and abetting liability; (11) failure to supervise; (12) agency liability; (13) unjust enrichment; and (14) promissory estoppel, detrimental reliance, waiver and ratification.

25. The Sterling Trust seeks actual damages in the amount of $10,000,000, punitive damages in the amount of at least three times the actual damages award and/or trebled damages based on violations of the Texas Deceptive Trade Practices Act. The Sterling Trust also seeks attorneys' fees, pre and post-judgment interest, the costs and expenses incurred in the

prosecution of the Underlying Action, as well as a tax offset in the event of an award compensating the claimants.

26.     Ross tendered his defense in connection with the claims asserted against him in the Underlying Action to Liberty on or about May 30, 2003. Liberty denied coverage under the Liberty Policy in connection with the claims on or about July 7, 2003. Accordingly, an actual and justciable dispute presently exists between Liberty and Ross.

### Declaratory Relief

27.     Liberty adopts and repeats the allegations of paragraphs 1 through 26 as and for paragraph 27 as if the same were fully set forth herein.

28.     Liberty has no duty or obligation to defend or indemnify Ross in connection with the allegations against him in the Underlying Action for any one or more of the following reasons:

(a)     The allegations against Ross in the Underlying Action do not fall under the Insuring Agreement of the Liberty Policy. The claims against Ross arise out of Ross' conduct as a principal of the RBG Entities and their alleged involvement with real estate ventures. The Underlying Action does not allege any claims or acts, errors or omissions which arise out of the rendering or failure to render "professional legal services." Additionally, the Sterling Trust seeks punitive and/or statutory damages, as well as attorneys' fees and other costs. As such, the Underlying Action does not allege "damages" caused by any act, error, omission or personal injury arising out of the rendering or failure to render "professional legal services" as these terms are defined in and required by the Liberty Policy;

(b)     Alternatively, coverage for the claims against Ross in the Underlying Action is precluded by Exclusion 3. a. for "Certain Services and Capacities." The Underlying Action alleges that Ross is a principal and executive officer of the RBG Entities. Exclusion 3. a. precludes coverage where, as here, the claims allegedly arise out of Ross' services and/or capacity for an organization in which Ross is an officer, director, partner, trustee, manager, operator or employee. Accordingly, Exclusion 3. a. precludes coverage for the claims against Ross in the Underlying Action;

(c)     Alternatively, coverage for the claims against Ross in the Underlying Action is precluded by Exclusion 6, as amended by the Part-Time Attorney Endorsement to the Liberty Policy. The Underlying Action alleges that Ross is a principal and executive officer of the RBG Entities. Exclusion 6 precludes coverage where, as here, the claims allegedly arise out of services performed by Ross for an organization in which Ross is an owner; and

(d)     Alternatively, coverage for the claims against Ross in the Underlying Action is precluded by Exclusion 1 for "Known Claims or Circumstances." The Underlying Action alleges that Ross participated in the real estate ventures in the early 1990's and into the late 1990's. Based on these allegations, the conduct that allegedly caused the claimants' damages occurred prior to the inception of the Liberty Policy on March 1, 2003. Accordingly, to the extent that Ross had a reasonable basis to believe that he breached a professional duty, committed a wrongful act, violated a disciplinary rule, engaged in professional misconduct or could foresee that a claim would be made against him prior to the inception of the Liberty Policy, coverage is precluded by Exclusion 1.

29.     By reason of the foregoing, an actual and justiciable controversy exists between Liberty and Ross which may be determined by a judgment or order of this Court. Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has the power to declare and adjudicate the rights and liabilities of the parties to the Liberty Policy.

WHEREFORE, Plaintiff, Liberty Insurance Underwriters, Inc., respectfully requests that this Court enter judgment finding and declaring that Liberty Insurance Underwriters, Inc. has no duty or obligation to defend and indemnify Robert S. Ross under Policy No. LPJ093587-0103 for the claims set forth against him in the Arbitration Complaint filed in the Underlying Action, and further granting Liberty Insurance Underwriters, Inc. such other relief as the Court deems just and fit under the circumstances.

Respectfully submitted.

LIBERTY INSURANCE UNDERWRITERS,
INC.

By: _____
One of Its Attorneys

Terry D. Weissman (#6211582)
Christopher D. Mickus (#6270275)
NEAL GERBER & EISENBERG LLP
Two North LaSalle Street,
Suite 2200
Chicago, Illinois 60602
312/269-8000

NGEDOCS :015544.0601 856382.1



LIBERTY
INSURANCE
UNDERWRITERS, INC.
(The Liberty Mutual Group)

> Liberty Insurance Underwriters,
> Inc.
> 61 Broadway
> New York, NY 10006

LIU 1301 Ed. 11 00

## LIBERTY INSURANCE UNDERWRITERS, INC. (The Liberty Mutual Group)

# ILLINOIS LAWYERS PROFESSIONAL LIABILITY POLICY

### DECLARATIONS

**NOTICE: THIS IS A CLAIMS MADE AND REPORTED POLICY. THIS POLICY COVERS ONLY CLAIMS FIRST MADE DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE, AND REPORTED DURING THE POLICY PERIOD OR EXTENDED REPORTING PERIOD, IF APPLICABLE, AND OTHERWISE COVERED BY THIS INSURANCE. PLEASE READ THE POLICY CAREFULLY AND DISCUSS THE COVERAGE WITH YOUR INSURANCE AGENT OR BROKER.**

**POLICY NUMBER: LPJ093587-0103**      **RENEWAL OF: NEW**

**PRODUCER AND ADDRESS:**      JLT Services Corporation
13 Cornell Rd
Latham NY 12110

**NAMED INSURED AND ADDRESS:**   Robert S. Ross
Attorney At Law
154 West Hubbard Street, Suite 400
Chicago, IL 60610

**THE NAMED INSURED IS:**   [X]  Individual    [ ]  Partnership
[ ]  Corporation    [ ]  Limited Liability Partnership
[ ]  Limited Liability Corporation        [ ]  Other

**POLICY PERIOD:**      From:   03/01/03   To:    03/01/04
(12:01 A.M. at the Named Insured's address set forth above)

**LIMIT OF LIABILITY:**   $1,000,000        Each Claim
$1,000,000        Aggregate

**DEDUCTIBLE:**      $10,000        Each Claim

**PREMIUM:**      $1,449.00
**ENDORSEMENTS FORMING PART OF THIS POLICY AT ISSUANCE:**
**TRIA FORM C (ed. 1/03/03)**
**LIU 1300 ED.01 01   LIU 1321 ED.03 01**

This Declarations page, together with the Application, the attached Illinois Lawyers Professional Liability Insurance Policy, and all endorsements thereto, shall constitute the contract between Liberty Insurance Underwriters, Inc. and the Named Insured identified above. This policy is valid only if signed below by a duly authorized representative of Liberty Insurance Underwriters, Inc.

_____          _____
**Authorized Representative**                **Issue Date**

**Exhibit A**



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

### THIS IS A CLAIMS-MADE POLICY. PLEASE READ IT CAREFULLY.

## ILLINOIS LAWYERS PROFESSIONAL LIABILITY POLICY

### Preface

This policy provides professional liability protection for your law firm. The terms **we, us,** and **our** refer to Liberty Insurance Underwriters, Inc., the company issuing this policy, and the terms **you** and **your** refer to those persons or legal entities insured by this policy. The **named insured**, an entity incorporated within the terms **you** and **your**, has special duties and responsibilities, which are described in the policy.

Various terms used in this policy have special definitions. When specially defined terms are used they will be printed in uncapitalized, boldface type **thus**. A list of the policy's specially defined terms is contained in the **Definitions** section of the policy. This policy also contains sections and sub-sections that will have titles printed **Thus**. These titles are provided for informational purposes only and do not have special meanings. Irrespective of its title, the meaning of each section or sub-section is expressed solely by its contents.

This policy is organized into the following sections:

**Preface**
**Coverage**
**Definitions**
**Special Benefits**
**Territory**
**Exclusions**
**Limits of Liability & Deductible**
**Defense of Claims**
**Claims**
**Extended Reporting Periods**
**Conditions**

There are exclusions and conditions that apply to the coverage provided by this policy. All persons and entities afforded protection by the policy should read it carefully. This preface is provided for information only and does not provide or modify coverage.

### Coverage

**We** agree with the **named insured** that in consideration of the premium paid, **your** obligation to pay the deductible, and in reliance upon the statements made by the **named insured** in the application, the Declarations, and supplementary information provided by the **named insured**, and subject to the limits of liability as stated in the Declarations, and the exclusions and all other terms and conditions of this policy, as follows:

**We** agree to pay on **your** behalf all **damages** in excess of the deductible amount and up to the limits of liability stated in the Declarations that **you** become legally obligated to pay, provided such **damages**:

1. result from **claims**

   a. first made against **you** during the **policy period** or any extended reporting period, if applicable, and
   b. reported to **us** in writing; and

2. are caused by a **wrongful act** which takes place before or during the **policy period** but not before the Retroactive Date set forth in the Declarations, if any.



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

## Definitions

Whenever the specially defined terms below are used in the policy they will be printed in uncapitalized, boldface type **thus**.

1. **bodily injury** means physical injury, sickness, disease or death of any person.

2. **claim** means a demand received by **you** for money or services, including the service of suit or institution of arbitration proceedings against **you**, or a **disciplinary proceeding**.

3. **claim expenses** means:

    a. reasonable and necessary fees charged by any lawyer designated by **us**;

    b. all reasonable and necessary fees and expenses charged by any lawyer selected by **you** as independent counsel, where a conflict of interest exists and applicable law permits **you** to select such independent counsel and requires **us** to pay for such independent counsel;

    c. all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **claim**, if incurred by **us**;

    d. all costs allocated to **you** in suits or proceedings and all interest on the entire amount of any judgment therein which accrues after entry of the judgment and before **we** have paid or tendered or deposited, whether in court or otherwise, but only as respects that part of the judgment which does not exceed the limit of **our** liability thereof; and

    e. premiums on appeal bonds and premiums on bonds to release attachments in such suits, but not for bond amounts in excess of the applicable limit of liability of this policy. **We** shall have no obligation to pay for or furnish any bond.

    However, **claim expenses** does not include salary charges of **our** regular employees or officials. None of **your**

fees, costs or expenses is **claim expenses** except those costs and expenses related strictly to the defense of a **disciplinary proceeding.**

4. **damages** means a monetary judgment or settlement, but does not include fines or statutory penalties, sanctions whether imposed by law or otherwise, any other amount awarded in any **disciplinary proceeding**, the return of or restitution of legal fees, costs and expenses, punitive or exemplary damages, the multiplied portion of multiplied **damages**, amounts for which **you** are not financially liable or which are without legal recourse to **you** or matters which may be deemed uninsurable under applicable law.

5. **disciplinary proceeding** means a proceeding in which a complaint alleging a **wrongful act**, a violation of any disciplinary rule or other professional misconduct is brought before a tribunal of competent jurisdiction which shall make a determination subject to appeal or other review and/or a final and enforceable determination as to whether such alleged professional misconduct is to be the subject of discipline.

6. **named insured** means the person or entity designated in the Declarations and any **predecessor** of such entity.

7. **organization** means a corporation, partnership, association, trust or fund, (including a pension, welfare, profit sharing, mutual or investment fund or trust) or any other business enterprise or charitable organization of any kind or nature.

8. **personal injury** means

    a. false arrest, humiliation, detention or imprisonment, wrongful entry, eviction or other invasion of private occupancy, abusive litigation (criminal or civil), abuse of process, malicious prosecution;

    b. the publication or utterance of a libel or slander or other defamatory or disparaging material, or a



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

publication or utterance in violation of an individual's right of privacy; or

c. injury arising out of an offense occurring in the course of the **named insured's** advertising activities, including but not limited to infringement of copyright, title slogan, patent, trademark, trade dress, trade names, service mark or service number.

9. **policy period** means the period from the inception date of this policy to the policy expiration date as set forth in the Declarations or its earlier termination date, if any.

10. **predecessor** means any individual or entity engaged in the practice of law to whose financial assets and liabilities the **named insured** is the majority successor in interest.

11. **professional legal services** means legal services and activities performed for others as:

a. a lawyer;
b. a notary public;
c. an arbitrator;
d. a mediator;
e. a title insurance agent;
f. a designated issuing lawyer to a title insurance company;
g. a court-appointed fiduciary;
h. a member of a bar association, ethics, peer review, formal accreditation or licensing, or similar professional board or committee;
i. an author, strictly in the publication or presentation of research papers or similar materials and only if the fees generated from such work are not greater than ten thousand dollars ($10,000); and/or
j. an administrator, conservator, receiver, executor, guardian, or any similar fiduciary capacity, or court-appointed trustee, however, no coverage shall apply to any loss sustained by **you** as the beneficiary or distributee of any trust or estate.

Services performed by **you** in a lawyer-client relationship on behalf of one or

more clients shall be deemed for the purpose of this section to be professional services in **your** capacity as a lawyer, although such services could be performed wholly or in part by nonlawyers.

12. **property damage** means injury to or destruction of any tangible property or loss of use therefrom. Tangible property does not include currency and negotiable instruments.

13. **totally and permanently disabled** means that **you** have become so disabled as to be wholly prevented from rendering **professional legal services** provided that such disability:

a. has existed continuously for not less than 6 months; and
b. is expected to be continuous and permanent.

However, **totally and permanently disabled** shall not include any condition which:

a. occurred as a result of war or acts of war, whether or not declared;
b. occurred during active service in the armed forces of any country; or
c. results from:
   1. intentionally self-inflicted injuries;
   2. attempted suicide, whether or not sane; or
   3. the abuse or misuse of chemical compounds or alcohol.

14. **we, us, our** and **ours** refer to Liberty Insurance Underwriters, Inc., the company issuing this insurance.

15. **wrongful act** means any actual or alleged act, error, omission or **personal injury** which arises out of the rendering or failure to render **professional legal services.**

16. **you** means:

a. if the **named insured** is an individual, such individual;



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

b. if the **named insured** is a partnership or limited liability partnership, such partnership or limited liability partnership and each lawyer who is a partner thereof including any incorporated partner and each shareholder of any such incorporated partner;

c. if the **named insured** is a professional corporation, limited liability corporation or professional association, such professional corporation, limited liability corporation or professional association and each lawyer who is a shareholder or member thereof;

d. each lawyer employed by the **named insured**;

e. any person

   1. who qualified prior to the **policy period**, but who no longer qualified as of the first day of the **policy period**; or
   2. who during the **policy period** qualifies

   as an **insured** under b., c., or d., immediately above, but only to the extent such person performs or has performed **professional legal services** on behalf of the **named insured**;

f. each lawyer acting as "of counsel" but only while performing **professional legal services** on behalf of the **named insured**;

g. any lawyer who is acting as an independent contractor or on a per diem basis to the **named insured**, but only as respects **professional legal services** rendered on behalf of the **named insured**;

h. all nonlawyer employees who were, are now or become employees of the **named insured**, but only while acting within the scope of their employment on behalf of the **named insured**;

i. the estate, heirs, executors, administrators, assigns and legal representatives of each of **you** in the event of **your** death, incapacity, insolvency or bankruptcy, but only to the extent

that **you** would otherwise be provided coverage under this policy.

17. **your** means belonging to **you.**

**Special Benefits**

1. **Claim Expenses.**

   a. The first $2,500 of **claim expenses** incurred by **us** during the **policy period** shall not apply to the deductible.

   b. If the "per **claim**" limit of liability stated in the Declarations is less than $500,000, the first $100,000 of **claim expenses** incurred by **us** during the **policy period** shall not apply to the limits of liability.

   c. If the "per **claim**" limit of liability stated in the Declarations is at least $500,000 but is less than $2,000,000, the first $250,000 of **claim expenses** incurred by **us** during the **policy period** shall not apply to the limits of liability.

   d. If the "per **claim**" limit of liability stated in the Declarations is $2,000,000 or more, the first $500,000 of **claim expenses** incurred by **us** during the **policy period** shall not apply to the limits of liability.

2. **Disciplinary Proceeding Defense Cost Reimbursement.** If a **disciplinary proceeding** is brought against **you**, **we** will reimburse reasonable costs that **you** incur in the defense of such matters, provided **you** do not admit all or any part of the allegation. Any reimbursement made pursuant to this sub-section will be in addition to the limits of liability set forth in the Declarations.

   The most **we** will reimburse for any one **disciplinary proceeding** is $25,000. The most **we** will reimburse during the policy period or any extended reporting period, if applicable, for all **disciplinary proceedings** is $100,000 in the



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

aggregate. **Our** determination as to the reasonableness of fees, costs and expenses will be conclusive on **you. We** will waive **your** deductible with respect to reimbursements made under this sub-section.

3. **Loss of Earnings.** If **we** request in writing that **you** attend a trial, hearing, or arbitration proceeding pursuant to the resolution of a **claim, we** will pay **you** up to $500 per day for **your** loss of earnings for each such day or part thereof **you** attend. The most **we** will pay under this sub-section is $10,000 each **claim** and $50,000 in the aggregate for all **claims** made during the **policy period** or extended reporting period, if applicable. Any payment made pursuant to this sub-section will be in addition to the limits of liability set forth in the Declarations.

4. **Reduced Deductible for Arbitrated or Mediated Claims. We** will reduce the deductible amount stated in the Declarations by fifty percent (50%) if **you** agree with a request **we** make, and agree with the terms and conditions **we** specify, to submit a **claim** made against **you** to binding arbitration or mediation. While the right to submit a **claim** to binding arbitration or mediation shall be **ours** solely, no **claim** shall be submitted to arbitration without **your** prior written consent. In the case of mediation, the maximum dollar amount the deductible will be reduced under this special benefit is $2,500.

**Territory**

The insurance afforded applies worldwide.

**Exclusions**

1. **Known Claims or Circumstances.** This policy does not apply to any **claim** arising out of a **wrongful act** occurring prior to the **policy period** if, prior to the effective date of the first Lawyers Professional Liability Insurance Policy issued by **us** to the **named insured** and continuously renewed and

maintained in effect to the inception of this **policy period:**

   a. **you** gave notice to any prior insurer of any such **claim** or **wrongful act;**

   b. **you** had a reasonable basis to believe that **you** had breached a professional duty, committed a **wrongful act,** violated a disciplinary rule, engaged in professional misconduct or to foresee that a **claim** would be made against **you;** or

   c. there is a prior policy or policies which provide insurance for such **wrongful act** or **claim,** unless the available limits of liability of such prior policy or policies are insufficient to pay any liability or **claim,** in which event this policy will be excess over any such prior coverage, subject to this policy's terms, limits of liability, exclusions and conditions.

2. **Fraudulent, Criminal, Malicious, Deliberately Wrongful Acts, or Omissions.** This policy does not apply to any judgment or final adjudication based upon, arising out of or in any way related to any dishonest, fraudulent, criminal, malicious or deliberately wrongful acts or omissions committed by **you. We** will defend allegations of the foregoing acts or omissions until the time they are finally adjudicated or admitted by **you.**

This exclusion does not apply to each of **you** who did not personally commit, personally participate in committing, or remain passive after learning about one or more of the acts or omissions described in this exclusion. However, **our** obligation to provide coverage in any such case shall be excess of the deductible and excess of the full extent of any assets in the **named insured,** or monetary value attributed to such assets, of anyone to whom this exclusion applies.

3. **Certain Services and Capacities.** This policy does not apply to any **claim**



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

arising out of **your** services and/or capacity as:

a. an officer, director, partner, trustee, manager, operator, or employee of an **organization** other than that of the **named insured**, except this exclusion does not apply to a court-appointed trustee;

b. a public official, or an employee of a governmental body, subdivision, or agency;

c. a fiduciary under the Employee Retirement Income Security Act of 1974 and its amendments thereto, or similar federal, state, local or common law, or any regulation or order issued pursuant thereto, except if **you** are deemed to be a fiduciary solely by reason of legal advice rendered with respect to an employee benefit plan.

4. **Bodily Injury and Property Damage.** This policy does not apply to any **claim** based upon or arising out of **bodily injury** or **property damage**, unless:

a. the liability for such **claim** is caused by the performance of **professional legal services** by **you**;

b. such **bodily injury** or **property damage** would not have otherwise occurred directly or indirectly but for the performance of **professional legal services** by **you** and no other cause or circumstance contributed to the loss, including but not limited to the negligence of a third party;

c. such **bodily injury** or **property damage** takes place on premises occupied by the **named insured**;

d. such **bodily injury** does not happen to **you** and such **property damage** does not occur to any property owned by **you**;

e. the liability for such **claim** does not arise directly or indirectly out of any obligation under any workers' compensation, disability benefits or unemployment compensation law or any similar law;

f. such **bodily injury** or **property damage** does not arise out of actual, alleged or threatened pollution; and

g. the liability for such **claim** does not arise directly or indirectly out of the use, ownership, and/or maintenance of owned, nonowned, hired, rented, or loaned automobiles, trucks, aircraft or watercraft by **you**.

However, this exclusion does not apply to mental illness or emotional distress or humiliation caused by **personal injury**.

5. **Insured versus Insured.** For the purpose of this sub-section, the term "insured" shall mean "you." This policy does not apply to any **claim** made by one or more insured against another insured unless an attorney/client relationship exists.

6. **Equity Interests.** If a person insured under this policy owns, along with his or her spouse, ten percent (10%) or more of the issued and outstanding shares, units or other portions of the capital of an **organization**, and that person simultaneously provides **professional legal services** with respect to such an **organization**, this policy will provide no coverage to that person for any **claims** that result therefrom.

If the collective equity interest of:

a. all persons and entities insured under this policy;

b. spouses of persons insured under this policy; and

c. the **named insured**

is thirty-five percent (35%) or more of the issued and outstanding shares, units or other portions of the capital of an **organization**, and any person insured simultaneously provides **professional legal services** with respect to such an **organization**, this policy will provide no coverage to any person insured or to the **named insured** for any **claims** that result therefrom.



**LIBERTY**
**INSURANCE**
**UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

**Limits of Liability & Deductible**

1. **Claim expenses.** **Claim expenses** reduce this policy's limits of liability and **claim expenses** apply to this policy's deductible. However, subject to specific conditions and limitations, a certain amount of **claim expenses** do not apply to the limits of liability or to the deductible as fully described in the **Special Benefits** section of the policy.

2. **Limits of Liability - Each Claim.** The most **we** will pay for **damages** and **claim expenses** for each **claim** is specified as "each claim" in the limits of liability section of the Declarations and is subject always to the amount specified as "aggregate" in the limits of liability section of the Declarations.

3. **Limits of Liability – Aggregate.** The most **we** will pay for **damages** and **claim expenses** for all **claims** is specified as "aggregate" in the limits of liability section of the Declarations.

4. **Deductible.** The deductible amount stated in the Declarations shall apply to all **damages** and **claim expenses** for each and every **claim**, and must be paid by **you** as a condition precedent to payment of any loss by **us**. Each person insured is liable for payment of the deductible. **You** must pay such deductible amount within thirty (30) days of **our** written request therefor regardless of the number of **claims** made under this policy. The deductible shall automatically be reduced by fifty percent (50%) for arbitrated or mediated **claims** under specific conditions, and subject to certain limitations, that are described fully in the **Special Benefits** section of this policy.

5. **Multiple Policies Issued by Us Covering the Same Claim.** If two or more policies of Lawyers Professional Liability Insurance issued by **us** covering **you** apply to the same **claim** or **claims** for which **you** are jointly and severally liable, **we** shall not be liable under this policy for a greater proportion of such **damages** than **our** liability under this policy bears to **our** total liability under all applicable valid and collectible insurance issued by **us**, provided

that **we** shall not pay on **your** behalf any sum that exceeds the limit of liability of that policy issued by **us** that has the highest applicable limits of liability. In such circumstances, **you** will not be responsible under this policy for a greater proportion of the deductible than **your** responsibility under this policy bears to **your** total responsibility for all applicable deductibles, provided that **you** will not be responsible for any amount that exceeds the deductible of that policy issued by **us** that has the highest applicable deductible.

6. **Multiple Insureds, Claims and Claimants.** Neither the making of a **claim** against more than one of **you** nor the making of **claims** by more than one person or entity shall operate to increase **our** limits of liability. **Claims** alleging, based upon, arising out of or attributable to the same or related **wrongful acts** shall be treated as a single **claim** regardless of whether made against one or more than one of **you**. All such **claims**, whenever made, shall be considered first made during the **policy period** or any extended reporting period in which the earliest **claim** arising out of such **wrongful acts** was first made, and all such **claims** shall be subject to the same limits of liability.

**Defense of Claims**

**We** have the right and duty to defend any **claim** against **you** including the appeal thereof seeking **damages** to which this insurance applies even if any of the allegations of the suit are groundless, false, or fraudulent. This policy contains a provision whereby **we** will reimburse **you** for certain costs **you** incur as a result of defending a **disciplinary proceeding** against **you**, however, **we** have no duty to defend **you** in a **disciplinary proceeding**. This provision is described fully in the **Special Benefits** section of this policy.

**We** have the right to make any investigation **we** deem necessary and, with **your** written consent, any settlement of any **claim** covered by the terms of this policy. If **you** refuse to consent to any settlement or compromise recommended by **us** and acceptable to the claimant and elect to contest the **claim**, then **our** liability under this



**LIBERTY**
**INSURANCE**
**UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

policy shall be limited to the amount for which **we** would have been liable for **damages** and **claim expenses** if the **claim** had been so settled or compromised, when and as so recommended. **We** shall have no liability for **claim expenses** incurred thereafter and shall have the right to withdraw from the further investigation and/or defense thereof by tendering control of such investigation or defense to **you**, and **you** agree, as a condition of the issuance of this policy, to accept such tender.

**Claims**

1. **Notice of Claims.** **You** must give **us** written notice of any **claim(s)** or potential **claim(s)** made against **you** as soon as practicable but not later than sixty (60) days after expiration of the policy period or an extended reporting period, if applicable. In the event suit is brought against **you**, **you** must immediately forward to **us** every demand, notice, summons, complaint or other process received directly or by **your** representatives. Written notice of any claim against **you**, as well as of each demand on or action against **us**, must be delivered to **us** addressed as follows:

> Liberty Insurance Underwriters, Inc.
> 61 Broadway, 32nd Floor
> New York, NY 10006
> Attention: Claims Division

All notices to **us** must be in writing. Notice given by or on behalf of **you**, or written notice by or on behalf of any claimant, to **our** agent shall be considered notice to **us**.

Whenever coverage under this policy would be excluded, suspended or lost because of noncompliance with this sub-section entitled **Notice of Claims**, **we** agree to waive this exclusion, suspension or loss of coverage with respect to each of **you** who did not personally fail to comply with, personally participate in failing to comply with, or remain passive after learning about noncompliance with the requirements of this sub-section.

2. **Discovery Clause.** Should **you** first become aware during the **policy period** or any extended reporting period, if applicable, of a **wrongful act** for which coverage is

otherwise provided hereunder, and should **you** during the **policy period** or any extended reporting period, if applicable, give written notice to **us** of:

a. the specific **wrongful act**;
b. the injury or **damage** which has resulted or may result from such **wrongful act**; and
c. the circumstances by which **you** first became aware of such **wrongful act**,

then any **claim** that may subsequently be made against **you** arising out of such **wrongful act** shall be deemed for the purposes of this insurance to have been made during the **policy period** or any extended reporting period, if applicable.

3. **Assistance and Cooperation.** **You** must cooperate with **us** and upon **our** request **you** must submit to examination and interrogation by **our** representative, under oath if required, and must attend hearings, depositions and trials, and must assist in effecting settlement, securing and giving evidence, obtaining the attendance of witnesses, and in the conduct of suits and other proceedings, as well as in the giving of a written statement or statements to **our** representatives, including investigating and coverage counsel, and meeting with such representatives for the purpose of investigation, including the investigation of coverage issues and/or defense, all without charge to **us**. **You** must further cooperate with **us** and do whatever is necessary to secure and effect any rights of indemnity, contribution or apportionment that **you** may have. **You** must not, except at **your** own cost, make any payment, admit any liability, settle any **claims**, assume any obligation or incur any expense without **our** prior written consent.

4. **False or Fraudulent Claims.** If **you** commit fraud in proffering any **claim** under this policy as regards amount or otherwise, the insurance provided under this policy shall become void as to **you** from the date such fraudulent **claim** is proffered.



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

**Extended Reporting Periods**

1. **Automatic Extended Reporting Period.**
If the **named insured** or **we** cancel or
refuse to renew this policy, then the
insurance afforded by this policy shall be
automatically extended, subject otherwise to
its terms, limits of liability, exclusions and
conditions, to apply to **claims** first made
against **you** during the sixty (60) days
immediately following the effective date of
such nonrenewal or cancellation, but only by
reason of a **wrongful act** occurring before
such effective date and otherwise covered by
this insurance. Such period shall hereinafter
be referred to as the "Automatic Extended
Reporting Period."

   2. **Optional Extended Reporting
   Period.** If the **named insured** or **we**
   cancel or refuse to renew this policy,
   then the **named insured**, upon
   payment of an additional premium as
   set forth below, shall have the option to
   extend the insurance afforded by this
   policy for a specific time period, subject
   otherwise to its terms, limits of liability,
   exclusions and conditions, to apply to
   **claims** first made against **you**
   immediately following the effective date
   of such nonrenewal or cancellation.
   However, this extension of coverage
   shall only apply to **wrongful acts**
   occurring before such effective date and
   otherwise covered by this insurance.

   A specific extension period must be
   selected by the **named insured.**
   Extension period options are listed
   below with an additional premium set
   forth opposite each option. The
   additional premiums stated are a
   percentage of the full annual premium
   of this policy, less any return premium
   owed because of cancellation, plus any
   premium owed **us** for this policy.

| Option | Additional Premium |
| --- | --- |
| 1 year | 100% |
| 2 years | 135% |
| 3 years | 150% |
| 5 years | 185% |
| Unlimited | 225% |

The extension of coverage described in
this sub-section entitled **Optional
Extended Reporting Period** shall be
endorsed hereto, if purchased, and shall
hereinafter be referred to as the
"Optional Extended Reporting Period."

At the commencement of the Optional
Extended Reporting Period, the entire
premium therefor shall be deemed
earned. The Optional Extended
Reporting Period shall not be cancelable.

For purposes of determining the length
of the Optional Extended Reporting
Period, the Automatic Extended
Reporting Period shall be included.

3. **Electing the Optional Extended
Reporting Period.** The named
**insured's** right to elect the Optional
Extended Reporting Period must be
exercised by notice in writing not later
than sixty (60) days after the effective
date of the nonrenewal or cancellation
of this policy. Such notice by the
**named insured** must indicate the total
extension period desired and must
include payment of premium for such
extension period.

If such notice is not timely given to **us**,
the **named insured** shall not at a later
date be able to exercise such right. In
the event **you** become aware of any
**claim** against **you** during the **policy
period** but do not report such **claim** to
**us** until the Optional Extended
Reporting Period, if purchased, such
**claim** shall be deemed to have been
made and reported during the **policy
period.**



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

4. **Optional Extended Reporting Period Limits of Liability.** If **we** offer to renew this policy and the **named insured** refuses to accept such renewal offer, then **our** limit of liability for **claims** reported during the Optional Extended Reporting Period shall be reinstated to the limit of liability set forth in the Declarations. Otherwise, the following provisions will apply:

a. **Insured Three or More Years.** If, upon the effective date of such cancellation or nonrenewal, **we** have provided this insurance to the **named insured** on a claims made basis continually for three or more years, the aggregate limit of liability for the Optional Extended Reporting Period shall be equal to 100% of the aggregate limit of liability stated in the Declarations.

b. **Insured Less Than Three Years.** If, upon the effective date of such cancellation or nonrenewal, **we** have provided this insurance to the **named insured** on a claims made basis continually for less than three years, the aggregate limit of liability for the Optional Extended Reporting Period shall be equal to the greater of the amount of coverage remaining in such policy's aggregate limit or 50% of the aggregate limit of liability stated in the Declarations.

If other insurance exists which covers **claims** first made during the Automatic Extended Reporting Period or the Optional Extended Reporting Period, the coverage provided under this policy for any Automatic Extended Reporting Period or Optional Extended Reporting Period shall apply in excess of such insurance.

7. **Nonpracticing Extended Reporting Period.** The provisions of this sub-section entitled **Nonpracticing Extended Reporting Period** apply to each of **you** as individual lawyers, but not to lawyers acting as "of counsel," as an independent contractor, or on a per diem basis.

If **you** retire or otherwise cease the private practice of law during the **policy period**, then **you** have the option to extend the insurance afforded by this policy subject otherwise to its terms, limits of liability, exclusions and conditions, to apply to **claims** first made against **you** immediately following the date of the expiration of this policy or the effective date of this policy's cancellation, if sooner, but only by reason of a **wrongful act** committed by **you** before **your** date of retirement or termination of private practice and otherwise covered by the insurance, provided there is no other insurance in effect on or after **your** date of retirement or termination of practice which covers **you** for such liability or **claim**. If there is other insurance in effect on or after **your** date of retirement or termination of practice which covers **you** for such liability or **claim**, this coverage shall be excess of the limits of liability of such other insurance.

The extension of coverage described in this sub-section entitled **Nonpracticing Extended Reporting Period** shall be endorsed hereto, if purchased, and shall hereinafter be referred to as the "Nonpracticing Extended Reporting Period."

A specific Nonpracticing Extended Reporting Period period must be selected by **you**. Options are listed below with an additional premium set forth opposite each option. The additional premiums stated are a percentage of the full annual premium of this policy per insured lawyer.



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

| Option | Additional Premium |
|--------|--------------------|
| 1 year | 100% |
| 2 years | 135% |
| 3 years | 150% |
| 5 years | 185% |
| Unlimited | 225% |

**We** will waive the premium for the Nonpracticing Extended Reporting Period if **you:**

a. die, except by suicide;
b. become **totally and permanently disabled;** or
c. retire or otherwise cease the private practice of law during the **policy period** and have been insured by **us** under a Lawyers Professional Liability Policy continuously for the last three, full years.

The deductible amount and deductible provisions of this policy will be waived with respect to **claims** first made against **you** during the Nonpracticing Extended Reporting Period, if elected by **you.**

8. **Electing the Nonpracticing Extended Reporting Period.** The provisions of this sub-section entitled **Electing the Nonpracticing Extended Reporting Period** apply to each of **you** as individual lawyers, but not to lawyers acting as "of counsel," as an independent contractor, or on a per diem basis.

**Your** right to elect the Nonpracticing Reporting Period must be exercised by notice in writing not later than sixty (60) days after the date of the expiration of this policy or the effective date of this policy's cancellation, if sooner, or thirty (30) days from the date of mailing or delivery of such notice, whichever is later. Such notice must indicate the total extension period desired and must include payment of premium, if any, for such Nonpracticing Extended Reporting Period.

If such notice is not timely given to **us, you** will not at a later date be able to exercise such right.

9. **Nonpracticing Extended Reporting Period Limits of Liability.** The provisions of this sub-section entitled **Nonpracticing Extended Reporting Period Limits of Liability** apply to each of **you** as individual lawyers, but not to lawyers acting as "of counsel," as an independent contractor, or on a per diem basis.

The limits of liability stated in the Declarations shall be reinstated for **claims** first made against **you** during the Nonpracticing Extended Reporting Period, if elected by **you,** however, regardless of the number of Nonpracticing Extended Reporting Periods purchased, **our** liability shall not exceed the limits of liability set forth in the Declarations.

If the "each **claim**" and "aggregate" limits of liability stated in the Declarations are equal to or less than $250,000 and $750,000, respectively, then the "each **claim**" and "aggregate" limits of liability for **claims** first made and reported during each successive twelve-month period of the Nonpracticing Extended Reporting Period, if applicable, shall increase ten percent (10%) over the applicable "each **claim**" and "aggregate" limits of liability of the preceding twelve-month period, but in no case shall these limits of liability increase after the fourth twelve-month period, if applicable, nor shall the "aggregate" limit of liability be reinstated during each successive twelve-month period by virtue of this provision.

If other insurance exists which covers **claims** first made during the Nonpracticing Extended Reporting Period, the coverage provided under this policy for the Nonpracticing Extended Reporting Period shall apply in excess of such insurance.



LIBERTY
INSURANCE
UNDERWRITERS, INC.
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

## Conditions

1. **Firm Changes.** The **named insured** must report to **us** changes during the **policy period** which affect fifty percent (50%) or more of the lawyers insured at the inception of this policy. This notice must be provided within sixty (60) days of the change. The **named insured** does not have to report such changes to **us** if less than six (6) lawyers were insured at the inception of this policy. In the event of a merger, dissolution or acquisition, the **named insured** must use best efforts to notify **us** at least 30 days prior to the projected date of such change, but in no case shall the **named insured** provide **us** with less than five (5) days notice. In each case, **we** will have the right to accept, alter or decline coverage and to charge an additional premium.

2. **Subrogation.** In the event of any payment under this policy, **we** shall be subrogated to all **your** rights of recovery therefor against any person or entity, provided, however, **we** shall not exercise any rights of subrogation against any of **you** who did not commit the wrongdoing. **You** must execute and deliver instruments and papers and do whatever else is necessary to secure such rights and **you** must do nothing to prejudice such rights.

   Any amount recovered upon the exercise of such rights of subrogation shall be applied as follows: first, to the repayment of expenses incurred toward subrogation; second, to **damages** and/or **claim expenses** paid by **you** in excess of the limits of liability; third, to **damages** and/or **claim expenses** paid by **us**; fourth, to **damages** and/or **claim expenses** paid by **you** in excess of the deductible; and last, to repayment of the deductible.

3. **Action Against Us.** No action shall lie against **us** unless, as a condition precedent thereto, **you** shall have fully complied with all the terms of this policy, nor until the amount of **our** obligation to pay shall have been fully and finally determined either by judgment against **you** either after judgment against **you** or by written agreement of **you**, the claimant and **us**. In the event any person or entity or the legal representative thereof has secured a judgment against **you** and such judgment remains unsatisfied after the expiration of thirty (30) days from the service of notice of entry of the judgment upon **your** attorney, or upon **you**, and upon **us**, then an action may, except during a stay or limited stay of execution against **you** on such judgment, be maintained against **us** under this policy for the amount of such judgment to the extent of the insurance afforded by this policy.

   Nothing contained in this policy shall give any person or entity the right to join **us** as a co-defendant in any action against **you** to determine **your** liability. Bankruptcy or insolvency of **you** or of **your** estate shall not relieve **us** of any of **our** obligations hereunder.

4. **Application.** By acceptance of this policy, **you** agree that the statements in the application are personal representations, that they shall be deemed material and that this policy is issued in reliance upon such representations and that this policy embodies all agreements existing between **you** and **us**, or any of **our** agents, relating to this insurance.

5. **Other Insurance.** Subject to the limitation of coverage contained in Exclusion 1.c. in the **Exclusions** section of the policy for prior insurance, this insurance shall be in excess of the amount of the applicable deductible of this policy and any other valid insurance available to **you** which insurance is either collectible or uncollectible only because the limits of liability thereof shall have been exhausted, whether such other insurance is stated to be primary, pro rata, contributory, excess, contingent or otherwise, unless such other insurance is written only as a specific excess insurance over the limits of liability provided in this policy.

6. **Changes.** Notice to any agent or knowledge possessed by any agent or other person acting on behalf of **us** shall not effect a waiver or a change in any part of this policy or estop **us** from asserting any right under the terms of this policy, nor shall the terms of this policy be waived or changed,



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

except by written endorsement issued to form a part of this policy.

7. **Assignment.** Assignment of interest under this policy shall not bind **us** unless **our** consent is endorsed in writing hereon.

8. **Cancellation and Renewal.** The following cancellation and renewal procedures apply to this policy:

**Cancellation**

a. This policy may be cancelled by the **named insured** by surrender thereof to **us** or by mailing to **us** written notice stating when thereafter such cancellation shall be effective.

b. **Cancellation During First Sixty (60) Days.** If this policy has been in effect for sixty (60) days or less, **we** may cancel this policy by mailing to the **named insured** written notice of cancellation at least:

    i. ten (10) days prior to the effective date of cancellation if **we** cancel for nonpayment of premium; or

    ii. thirty (30) days prior to the effective date of cancellation if **we** cancel for any other reasons.

c. **Cancellation After Sixty (60) Days.** If this policy has been in effect for more than sixty (60) days, this policy may not be cancelled by **us** except for one or more of the following reasons:

    i. nonpayment of premium;

    ii. the policy was obtained through a material misrepresentation;

    iii. any person insured violated any of the terms and conditions of the policy;

    iv. the risk originally accepted has measurably increased;

    v. certification to the Director of **our** loss of reinsurance for all or a substantial part of the underlying risk insured; or

    vi. a determination by the Director that the continuation of the policy could place **us** in violation of the insurance laws of this state.

d. If **we** cancel the policy because **you** have failed to pay a premium when due, this policy may be canceled by **us** by mailing written notice of cancellation to **you** at least ten (10) days prior to the effective date of cancellation.

e. If **we** cancel this policy for any reason specified in Provision c. (i)-(vi) above, this policy may be canceled by **us** by mailing written notice to the **insured** at least sixty (60) days prior to the effective date of cancellation.

f. All notices of cancellation by **us** shall be mailed to the **named insured** at the last mailing address known by **us** and shall state the reason(s) for the cancellation. A copy of all such notices shall be sent to the **your** broker, if known. **We** shall maintain proof of mailing of such notice on a recognized U.S. Post Office form or a form acceptable to the U.S. Post Office. The mailing of notice as aforesaid shall be sufficient proof of notice. The time of the surrender of the effective date and hour of cancellation stated in the notice shall become the end of the **policy period.**

g. The **named insured** is authorized to act on behalf of all of **you** with respect to the giving and receiving of notice of cancellation and to the receiving of any return premium that may become payable under this policy.

h. If the **named insured** cancels, earned premium shall be computed in accordance with the short rate table and procedure in use for this policy. If **we** cancel, earned premium shall be computed pro



**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1300 Ed. 11 00

rata. Premium adjustment may be made either at the time cancellation is effected or as soon as practicable after cancellation becomes effective, but payment or tender or unearned premium is not a condition of cancellation.

**Nonrenewal**

a.  If **we** decide not to renew this policy, **we** shall mail written notice to the **named insured** and the mortgagee or lien holder at least sixty (60) days advance notice of **our** intention not to renew. The notice shall state the reason(s) for the nonrenewal. A copy of all such notices shall be sent to **your** broker, if known.

b.  In the event such notice is provided at least thirty-one (31) days but less than sixty (60) days prior to the expiration of the policy, **we** will extend the policy for sixty (60) days or until the effective date of any similar insurance procured by the **named insured**, whichever is less, on the same terms and conditions as the policy sought to be terminated.

c.  In the event such notice is provided less than thirty-one (31) days prior to the expiration of the policy, the policy shall be extended for a period of one (1) year or until the effective date of any similar insurance procured by the **named insured**, which ever is less, on the same terms and conditions as the policy sought to be terminated.

d.  The premium for extensions of coverage as described above shall be prorated in accordance with the amount of last year's premium. **We** shall be entitled to this premium for the extension of coverage and such extension may be contingent upon the payment of such premium.

9.  **Liberalization Clause.** If **we** adopt any revision that would broaden the coverage under the policy without additional premium at any time during the **policy period**, the broadened coverage will immediately apply to this policy.

IN WITNESS WHEREOF, **we** have caused this policy to be executed and attested, but this policy shall not be valid unless countersigned on the Declarations by **our** duly authorized representative.

President

Dexter R. Legg
Authorized Representative of
Liberty Mutual Insurance Company

**LIBERTY
INSURANCE
UNDERWRITERS, INC.**
(The Liberty Mutual Group)

LIU 1321 Ed. 03 01

## THIS ENDORSEMENT AMENDS THE POLICY. PLEASE READ IT CAREFULLY.

### PART-TIME ATTORNEY ENDORSEMENT-ILLINOIS

This endorsement modifies insurance provided under the following:

ILLINOIS LAWYERS PROFESSIONAL LIABILITY POLICY

In consideration of the premium charged, it is hereby agreed and understood that:

1. The definition of the term "**you**" contained in the policy is hereby deleted in its entirety and is replaced with the following:

    "**you**" means:

    a. the **named insured**;
    b. any non-lawyer who is an employee of the **named insured**, solely while acting within the scope of such person's duties as an employee; and
    c. the estate, heirs, executors, administrators, assigns and legal representatives of each of **you** in the event of **your** death, incapacity, insolvency or bankruptcy, but only to the extent that **you** would otherwise be provided coverage under this policy.

2. Exclusion 6 is deleted is its entirety and is replaced with the following:

    6. Equity Interests

    This policy provides no coverage for any claim based upon or arising out of **professional legal services** performed by **you** for any **organization** in which **you**, individually or collectively, own or owned any of the issued and outstanding shares, units or other portions of the **organization**.

**All other terms and conditions of the policy remain unchanged.**

06/12/2003 THU 11:07 [TX/RX NO 9030] ☑010

MAY 29 2003 12:17 FR JMB INSURANCE

# AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter of the Arbitration between | § |
| | § |
| THE STERLING TRUST COMPANY, ET AL | § |
| | § |
| Claimants, | § |
| | § |
| vs. | § |
| | § |
| | § |
| GUARANTY NATIONAL TITLE CO., | § |
| MR. ROBERT ROTHSTEIN | § |
| RBG NATIONAL, INC., | § |
| RBG FINANCIAL INC., | § |
| RBG MANAGEMENT SERVICES, INC., | § |
| RBG INVESTMENTS, INC., | § |
| BRUCE H. BLOCK, | § |
| ROBERT S. GOLDFINE, | § |
| ROBERT S. ROSS, | § |
| LORD, BISSELL & BROOK, | § |
| LOUIS E. ROSEN, ESQ. | § |
| SAITLIN, PATZIK, FRANK & SAMOTNY | § |
| ALAN B. PATZIK, ESQ., | § |
| HORWOOD, MARCUS, & BRAUN, | § |
| CHARLES BRAUN, ESQ. | § |
| | § |
| Respondents. | § |

## STATEMENT OF CLAIM

Claimants by and thru the undersigned counsel hereby request arbitration of disputes

arising out of the mishandling of their promissory note investments by "Respondents".

Case: 1:03-cv-05931 Document #: 1-95 Filed: 08/08/03 Page 29 of 50 PageID #:29

# TABLE OF CONTENTS

PARTIES ............................................................................................................. 4

INTRODUCTION ................................................................................................. 7

COMPLIANCE FAILURE ..................................................................................... 9

    BREACH OF FIDUCIARY DUTY .................................................................. 9

    FRAUDULENT CONCEALMENT ................................................................ 10

LEGAL ANALYSIS ............................................................................................ 11

    Violations of Federal and State Securities Laws ..................................... 12

    Violations of the Texas Deceptive Trade Practices Act ........................... 12

    Violations of the Texas Business & Commerce Code ............................... 12

    Negligence/Gross Negligence/Breach of Industry Standards ................... 12

    Breach of Express & Implied Contract .................................................... 13

    Breach of Fiduciary Duty, Duty of Care and Duty of Loyalty ...... ............. 13

    Fraudulent Inducement, Fraudulent Concealment; Misrepresentation and

    Omission of Material Fact ....................................................................... 14

    Respondeat Superior .............................................................................. 14

    Controlling Person Liability .................................................................... 14

    Aiding and Abetting Liability .................................................................. 15

    Failure to Supervise .............................................................................. 15

    Agency Liability - Express & Apparent Authority .................................... 15

    Unjust Enrichment ................................................................................. 15

    Promissory Estoppel, Detrimental Reliance, Waiver and Ratification ....... 15

DEMAND FOR RELIEF ...................................................................................... 16

    Actual Damages ..................................................................................... 16

    Additional Damages ............................................................................... 16

JUN 12 2003 11:57 FR ENVIROMENTAL          212 208 4292 TO 9131225891747          P.11

MAY 29 2003 12:18 FR JMB INSURANCE

Punitive Damages..................................................................................................... 16

Treble Damages....................................................................................................... 17

Attorneys' Fees ....................................................................................................... 17

Interest .................................................................................................................... 18

Costs & Fees ........................................................................................................... 18

Tax offset................................................................................................................. 18

SITE FOR ARBITRATION .................................................................................. 18

# I.

## PARTIES

**A.   THE CLAIMANTS**

1.     The Sterling Trust Company ("Sterling Trust") serves as an administrator for investments made by many note holders.    Sterling Trust has authority to serve as nominal Claimants.    In addition, there are approximately one hundred and fifty additional note holders bringing the cumulative total to approximately of two hundred note-holder Claimants.

This case is brought as a multi-party action pursuant to the AAA Code of Arbitration Procedure.   There is a tremendous amount of legal and factual issues common to every Claimant.    For example, the commonality of legal issues includes but is not limited to the fact that each Claimant was defrauded by the exact same nonfeasance, malfeasance and misfeasance perpetrated by each respective respondent.   Moreover, the Claimants were represented by the same Agent of Record, Guaranty National Title Co. and respondent Robert Rothstein.   Additionally, Claimants' investments were issued and managed by the same entities (Respondent RBG entities).

Further, Claimants were incontrovertibly and admittedly embezzled by the same RBG principal whom used Claimants' monies to invest in, inter alia, web-based pornographic sites.   Similarly, Claimants represented about 95% of the investors in the fifteen subject limited partnerships.  Also, many of the Claimants invested in several of the fifteen limited partnerships at issue.   Another factual commonality among the investors is that they all had the same investment objective and risk tolerance concerning the subject securities and the majority of Claimants were senior citizens.   The limited partnerships that are the securities at issue also represent a factual commonality to the extent that they all involved real estate and comprised the real estate asset in each Claimant's investment portfolio.   Finally, the great majority of investors are Texas residents and therefore are able to bring claims under certain non-waivable Texas-based Statutes.

Regarding commonality of legal issues, a cursory review of the table of contents clearly demonstrates that the Claimants are each bringing the same identical claims.   Further, each Claimant has similar standing to the extent that they were victimized by the same misconduct that gives rise to the claims being brought.   Such misconduct includes, but is not limited to, nonfeasance by the note-holder/Claimants' agent-of-record,   respondent Guarantee National Title Company, embezzlement and fraudulent concealment by the RBG Entities and Principals,  and collusion and conspiracy, malfeasance and misfeasance by the Claimants' designated attorneys-of-record.

Such misconduct and pervasive breach of contractual duties owed the Claimants and enumerated in the private placement memorandums ("PPM's") associated with each real estate limited partnership proximately caused Claimants to suffer substantial pecuniary damage. Ultimately, the gravamen of the collective claims is that "but for" respondents' collective and individual egregious misconduct, Claimants would not have suffered remarkable losses. For example, as required per PPM, the Agent-of-Record, Guarantee National Title Company, was to serve in various capacities to protect the interests of the Claimants. One such capacity was that of essentially providing "escrow" services and to monitor the progress of the underlying real estate developers and the RBG-related entities and principals. Put simply, the Agent-of-Record was to receive and disburse funds to RBG-entities if and only if specific conditions precedent had been satisfied. The agent-of-record completely abdicated this duty.

## B.    THE RESPONDENT

1.     RBG National, Inc. is and was at all times relevant to the instant case, the General Partner responsible for managing several of the fifteen limited partnerships and is based in Chicago.

2.     RBG Management Services, Inc. is and was at all times relevant to the instant case, the General Partner responsible for managing several of the fifteen limited partnerships and is based in Chicago.

3.     RBG Financial, Inc. is and was at all times relevant to the instant case, an affiliate of the General Partner(s) responsible for managing several of the fifteen limited partnerships and is based in Chicago.

4.     RBG Investments, Inc. is and was at all times relevant to the instant case, an affiliate of the General Partner(s) responsible for managing several of the fifteen limited partnerships and is based in Chicago.

* Hereinafter Respondents 1-4 shall be referred to as the RBG respondents.

5.     Mr. Bruce H. Block is and was at all times relevant to this case, a principal and executive officer of the first four respondents identified immediately above. Notably, Mr. Block is an attorney.

6.     Mr. Robert S. Goldfine is and was at all times relevant to this case, a principal and executive officer of the first four respondents identified immediately above. Notably, Mr. Block is an attorney.

7.     Mr. Robert S. Ross is and was at all times relevant to this case, a principal and executive officer of the first four respondents identified immediately above. Notably, Mr. Block is an attorney.

MAY 29 2003 12:18 FR JMB INSURANCE          312 915 2244 TO 913122569174?          P.02 04

8.    Guaranty National Title Co. is and was at all times relevant to this case the Agent-of-Record with contractual obligation identified in the various private placement memorandums associated with the limited partnerships.

9.    Mr. Robert Rothstein is the employee of Guarantee National Title Co. responsible for the limited partnerships issued by respondents numbered 1-4. *Because Rothstien was acting within the scope of his employment at Respondents, his employer is liable for his acts under agency, derivative liability and control person liability. [See below Compliance Failure section and separately Claimants' Brief on Control Person & Derivative Liability].*

10.    Lord, Bissell & Brook is and was at all times relevant to this case designated as the Attorney-of-Record for certain limited partnerships with contractual obligations identified in the various private placement memorandums associated with the limited partnerships.

11.    Louis E. Rosen, Esq. is the employee of Lord, Bissell & Brook responsible for the limited partnerships issued by respondents numbered 1-4. *Because Rosen was acting within the scope of his employment at Respondents, his employer is liable for his acts under agency, derivative liability and control person liability. [See below Compliance Failure section and separately Claimants' Brief on Control Person & Derivative Liability].*

12.    Patzik, Frank & Samotny is and was at all times relevant to this case designated as the Attorney-of-Record for certain limited partnerships with contractual obligations identified in the various private placement memorandums associated with the limited partnerships.

13.    Alan B. Patzik, Esq. is the employee of Patzik, Frank & Samotny responsible for the limited partnerships issued by respondents numbered 1-4. *Because Rosen was acting within the scope of his employment at Respondents, his employer is liable for his acts under agency, derivative liability and control person liability. [See below Compliance Failure section and separately Claimants' Brief on Control Person & Derivative Liability].*

14.    Horwood, Marcus, & Berk, Chtd. is and was at all times relevant to this case designated as the Attorney-of-Record for certain limited partnerships with contractual obligations identified in the various private placement memorandums associated with the limited partnerships.

15.    Charles Braun, Esq. is the employee of Horwood, Marcus, & Berk, Chtd. responsible for the limited partnerships issued by respondents numbered 1-4. *Because Braun was acting within the scope of his employment at Respondents , his employer is liable for his*

Case: 1:03-cv-05531 Document #: 1 Filed: 08/08/03 Page 34 of 50 PageID #:34

*acts under agency, derivative liability and control person liability. [See below Compliance Failure section and separately Claimants' Brief on Control Person & Derivative Liability].*

## II.

## INTRODUCTION

1.      Beginning in the early 1990's and continuing into the late 1990's the RBG respondents issued fifteen limited partnerships in which Claimants invested about $20,000,000.00 thru the purchase of promissory notes in increments or units of $25,000.00

2.      The limited partnerships invested in residential and commercial real estate development throughout the country and used experienced builders to complete the various projects. It was the contractual duty of the Agent(s)- of -Record as well as the Attorney(s)-of-Record to ensure that during all phases of each project, the note-holder Claimants interests were protected and that monies were properly disbursed.

3.      Many of the note-holder Claimants were long-term clients of stockbrokers then associated with a common broker-dealer. Significantly, the principals of this broker-dealer devoted extensive time and energy to conducting due diligence concerning the RBG respondents and the principals thereof. Notably, the RBG principals each had in excess of twenty five years working successfully in real estate development and had been employed with some of the nation's top real estate development companies and had further served as real estate attorneys for many years.

4.      With further respect to due diligence, principals of the broker-dealer actually visited several proposed locations that certain limited partnerships intended to develop. Moreover, the appointment of an Agent of Record and an Attorney of Record for each limited partnership further served satisfy concerned parties that the progress of the limited partnerships would be timely and properly monitored. Indeed, the private placement memorandum associated with each limited partnership expressly and without qualification, identified the multiplicity of duties that the Agent-of-Record was required to complete vis-à-vis the respective partnerships to ensure that the underlying development progressed per schedule and that appropriate funds were timely disbursed to the participating note-holders.

5.      Naturally, of course, complete success of each project and related limited partnership was predicated upon many factors, including without limitation, the expertise of the RBG respondents as well as the real estate developer underlying each project. Other macroeconomic factors also were understood to impact the success of the projects and while the participating note-holders understood that return was not guaranteed, the prospects for these projects had been represented by respondents as highly encouraging.

MAY 29 2003 12:19 FR JMB INSURANCE

6. As the limited partnerships were issued in succession, various limited partnerships began returning money to the Claimant note-holders pursuant to the governing private placement memorandums. However, many other limited partnerships were either not making required periodic payments or were sporadically doing so despite the fact that investigation revealed that the real estate projects underlying the various limited partnerships had been completed successfully.

7. Requests for written updates directed to the RBG principals were not responded to. Numerous teleconferences to ascertain the status of the projects and return of principal and interest to the Claimant-Note-Holders were similarly fruitless. Remarkably, the Agent-of-Record has been particularly obstinate and recalcitrant in response to allegations of misfeasance, malfeasance and nonfeasance and completely failed to produce any documentation substantiating their compliance with their contractual duties to the Claimant Note-Holders.

8. Disturbingly, subsequent investigation of the RBG principals revealed that funds had been improperly diverted from the Note-Holders and instead invested in unrelated pet-projects of the RBG principals including investment in an internet porn site. Clearly, such embezzlement should have been detected and prevented by the remaining respondents, especially the Agent(s) and Attorney(s) of record.

9. As a consequence of the foregoing, and following considerable deliberation and provision of opportunity for the respondents to rectify matters and provide restitution to the Note-Holder Claimants, the undersigned counsel has been retained to obtain all legal and equitable relief available to Claimants.

## III.

## COMPLIANCE FAILURE

10. Respondents were directly responsible for establishing, implementing, and enforcing written supervisory procedures on an ongoing basis. Such procedures were required to be reasonably designed to detect and prevent the breach of contract and misconduct alleged herein.

11. Respondents's written supervisory procedures were inadequate in that they failed to anticipate or address in any reasonable or effective manner, the types of manipulative, deceptive, and other fraudulent conduct described herein. As such, there was a fundamental breakdown in supervision by each Respondent, which contributed to the very serious violations outlined above and below.

12. Under the circumstances, Respondents failed to adequately or reasonably execute their supervisory duties concerning its employees or authorized agents.

13. Ultimately, the misconduct should never have been permitted. By reason of the foregoing, Respondents violated their duties to Claimants and are therefore liable for the resulting damages of more than $10,000,000.00

## IV.

## STANDARDS

### 1. BREACH OF FIDUCIARY DUTY

14. Respondents clearly violated their fiduciary duty to the Claimant Note-Holders and grossly defrauded them. There are essentially two related reasons why. First, they never attempted to execute their contractual duties specifically established to prevent the misconduct at issue. New York and Texas law, which apply in this case, consider the relationship between a principal and his agent to be fiduciary in nature. Busch v. L.F. Rothschild & Co., 259 N.Y. S.2d 239 (1st Dept. 1965). See 11 N.Y. Jr. 2d Brokers § 45 (1981). These states impose a fiduciary duty on a principal to exercise good faith toward his agent and to do all in his power to protect the agent's interests. An agent also has a duty to use reasonable efforts to give its principal information relevant to the affairs that have been entrusted to it. See Restatement (Second) of Agency § 381 (1958). In practice this means executing its duties.

15. The term "scienter" is the mental state embracing intent to deceive, manipulate or defraud. This is the usual standard applied to fiduciaries and contractual

agents. However, when there is a fiduciary duty to the defrauded party, the showing of recklessness, rather the stricter standard of scienter involving proof of intent to defraud, is sufficient. In the Matter of Inserra, et al., SEC admin. Proc. File No. 3-6691, Opinion of Admin. Law Judge, Fed. SEC. L. Rep. (CCH) Par. 84,334 at 89,499 (Sept. 30, 1988). Reckless conduct is conduct that is highly unreasonable and that represents an extreme departure from the standard of ordinary care to the extent that the danger was either known to the broker or so obvious that the broker must have been aware of it. Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 44-47 (2d Cir. 1978), cert. denied, 439 U.S. 1039 (1978).

16.    In the Second Circuit, a showing of recklessness satisfies the scienter requirement for liability under section 10b-5 of the 1934 Federal Securities Act. IIT, an International Inv. Trust v. Cornfield, 619 F.2d 909, 923 (2d Cir. 1980). Proof of scienter is a "matter of inference from circumstantial evidence". Wechsler v. Steinberg, 733 F.2d 1054, 1058 (2d Cir. 1980), quoting Herman & McLean v. Huddleston, 459 U.S. 375, 390 n.30 (1983).

17.    Clearly, Respondents' failure to 1) detect the misconduct at issue; 2) "intervene", and 3) implement appropriate remedial measures, constitutes a showing of recklessness giving rise to culpability and liability.

2.    **FRAUDULENT CONCEALMENT**

18.    Respondents made misrepresentations and/or omissions of material facts concerning the status of the subject limited partnerships, which Claimants relied upon. Claimants' reliance upon the respondents was justified: They had no reason to believe that his fiduciaries were engaging in misconduct.

19.    Significantly, brokers and agents will be held responsible for misrepresenting material facts or failing to disclose them because customers, by and large, must rely upon the representations of their brokers and agents, especially when they are acting in the capacity of a fiduciary to the client. The Court of Appeals for the Second Circuit recognized this in Roby v. Corporation of Lloyd's, Fed. Sec. L. Rep. (CCH) ¶ 97,458 at 96,535 (U.S.C.A. 2d Cir. June 2, 1993) when it said:

20.    The framers of the securities laws were concerned principally with reversing the common law rule favoring caveat emptor ("buyer beware"). See e.g., SEC v. Arthur Goldin & Co., 584 F.2d 1018, 1025 n. 51 (D.C. Cir. 1978), cert. denied, 439 U.S. 1071 (1979). To this end, the securities laws are aimed at prospectively protecting American investors from injury by demanding full and fair disclosure. See e.g., Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 727-28, reh'g denied, 423 U.S. 884 (1975). Private actions exist under the securities laws not because Congress had an

overwhelming desire to shift losses after the fact, but rather because private actions provide a potent means of deterring the exploitation of American investors ...." [Id. at 96,561.]

## V.

## LEGAL ANALYSIS

21.     The foregoing activity caused Claimants damage. Based upon such facts, the causes of action which Claimants brings against Respondents include, but are not limited to, the following:

(1)     Violations of federal and state securities laws;

(2)     Violations of the Texas Deceptive Trade Practices Act;

(3)     Violations of the Texas Business & Commerce Code;

(4)     Negligence/gross negligence/breach of industry standards;

(5)     Breach of implied and express contract;

(6)     Breach of Fiduciary Duty, Duty of Care and Duty of Loyalty;

(7)     Common law fraud - misrepresentations and omissions; constructive fraud; and fraudulent concealment;

(8)     *Respondeat superior*;

(9)     Controlling person liability;

(10)    Aiding and abetting liability;

(11)    Failure to supervise;

(12)    Agency liability - express & apparent authority;

(13)    Unjust enrichment; and

(14)    Promissory Estoppel, Detrimental Reliance, Waiver and Ratification

MAY 29 2003 12:21  FR JMB INSURANCE        312 312 2247 TO ..............      . ... ..

### 1. Violations of Federal and State Securities Laws

22.    Respondents engaged in unlawful conduct in connection with the purchase and sale of securities by means of facilities of interstate commerce, the National Securities Exchanges, and by use of the mail. Respondents violated Sections 12, 15, and 17 of the Securities Act, as well as sections 10, 15, and 20 of Exchange Act.

23.    The Texas Securities Act provides that any person who offers for sale a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements not misleading, is liable to the buyer of the security, who may sue at law or in equity for rescission, or for damages if he no longer owns the security. Tex. Rev. Civ. Stat. and Art. 581-33A(1)-(2)

### 2. Violations of the Texas Deceptive Trade Practices Act

24.    Respondents violated the Texas Deceptive Trade Practices Act ('DTPA') by providing "services" to Claimants that included 'false, misleading, or deceptive acts or practices," as those terms are defined under DPTA § 1 7.46(a), in that Respondents made numerous material misstatements and omissions prescribed under DTPA §§ 17.26(b)(5), (7) and (23). Respondents' conduct was committed knowingly, thus entitling Claimants to three times his actual damages. Claimants also is entitled to recover reasonable attorneys' fees upon successfully proving a DTPA case.

### 3. Violations of the Texas Business & Commerce Code

25.    Respondents violated Texas Business and Commerce Code Section 27.01 by falsely representing, either by affirmation or failure to disclose material facts regarding the safety, security and potential risks of the subject investment(s). These false representations and/or omissions were made for the purpose of inducing Claimants to purchase and hold the subject investment(s). Respondents made such representations, omissions and/or false promises with actual awareness of the falsity. Respondents should have been aware of the falsity of such representations, omissions, and/or promises, and failed to disclose the falsity to Claimants. Respondents is liable to Claimants for actual and exemplary damages, attorney's fees, expert witness fees, and other damages under Section 27.01, for which Claimants now seeks to recover.

### 4. Negligence/Gross Negligence/Breach of Industry Standards

26.    The industry standard of care is set forth by the rules of the NASD, the NYSE, and the SEC; federal and state statutes, including the Texas Securities Act and the Penny Stock Reform Act; relevant case law; and the brokerage firms' own compliance manuals. Respondents is obligated to provide Claimants and Claimants is entitled to rely upon Respondents and its agents for competent, professional securities services in accordance with those industry rules, regulations, customs and practices. By their conduct as outlined above,

Case 1:03-cv-05531 Document # 1 Filed: 08/08/03 Page 40 of 50 PageID #:40

Case: 1:03-cv-05531 Document #: 1 Filed: 08/08/03 Page 41 of 50 PageID #:41

Respondents and its agents failed to abide by many of these rules including but not limited to the following:

(a) Article III, Section of the NASD Rules of Fair Practice ("High Standards of Commercial Honor/Equitable Principles of Trade");

(b) Article III, Section 18 of the NASD Rules of Fair Practice ("Manipulative, Deceptive or Fraudulent Devices or Contrivances").

(c) Rule 401 of the NYSE ("Good and Ethical Business Practices");

(d) Article III, Section 2 of the NASD Rules of Fair Practice ("Suitability");

(e) Rule 405 of the NYSE ("Know Your Customer");

(f) Article III, Section 27 of the NASD Rules of Fair Practice and Rule 405 of the NYSE ("Supervision");

(h) Article III, Section 35 of the NASD Rules of Fair Practice ("Improper Commissions");

(I) The statutory citations referenced herein; and

(J) Breaches of the standards of conduct presumably set forth in Respondents ' compliance manuals.

27. Claimants assert that the conduct of respondents and its agents were committed knowingly and with the intention to deceive. In the alternative, however, Respondents and its agents acted with reckless disregard for the rights and welfare of Claimants and were grossly negligent in failing to prevent the misconduct at issue.

## 5.    Breach of Express & Implied Contract

28. Respondents and its agents were obligated to provide Claimants with competent and professional services in accordance with applicable industry rules, regulations, customs and practices. Such obligations were mandated by the very nature of Respondents' business, business affiliations and undertakings for Claimants. Respondents and its agents wholly failed in their obligations to Claimants, thereby damaging them.

## 6.    Breach of Fiduciary Duty, Duty of Care and Duty of Loyalty

29. Respondents and its agents had a fiduciary duty to exercise the utmost good faith in dealing with Claimants, including but not limited to the following:

(a)   The duty to recommend a security only after studying it sufficiently to become informed as to its nature, price and financial prognosis;

(b)   The duty to inform the customer of the risks involved in purchasing or selling a particular security;

(c)   The duty to refrain from self-dealing;

(d)   The duty not to misrepresent any fact material to the transaction; and

(e)   The duty to act in the best interests of Claimants.

30.   By purchasing an investment in Claimants' account, Respondents and its agents represented and implied that they had made a diligent investigation of the product and its risks, and that they had a reasonable basis for purchasing it. Respondents and its agents either failed to exercise their duty to adequately investigate the investment or they made materially misleading and inaccurate statements about the investment despite such knowledge. Claimants wholly relied upon the representation made by the Respondents and its agents and, as a result, suffered losses.

## 7.   Fraudulent Inducement, Fraudulent Concealment; Misrepresentation and Omission of Material Fact

31.   In recommending and effecting an investment purchase for Claimants' account, Respondents and its agents engaged in fraudulent practices and made numerous representations and material omissions concerning the investments recommended by Respondents and its agents. Claimants reasonably relied upon these representations, was thereby induced to purchase and continue to hold the subject investment and was damaged thereby.

## 8.   Respondeat Superior

32.   At all times, the agents of various respondents were acting in the course of their employment at various Respondents. If the Panel finds that he is liable to Claimants for his wrongful conduct, then Respondents is likewise liable under the doctrine of *respondeat superior* ("let the master answer").

## 9.   Controlling Person Liability

33.   Respondents are controlling persons as that term is defined in 15 U.S.C. 78t(a) and Tex. Rev. Civ. Stat. Ann. Art. 581-33f. Respondents directly or indirectly

06/12/2003 THU 11:07 [TX/RX NO 9030] ✆025

controlled their employees. Accordingly, each Respondents is liable jointly and severally to Claimants for the losses created by their wrongful conduct of Respondents agent employees.

### 10. Aiding and Abetting Liability

34. Respondents are liable as aiders and abettors of their agent-employee's law violations, pursuant to Tex. Rev. Civ. Stat. Ann. Art. 581-33(F)(2) and common nonfeasance, malfeasance and misfeasance. Respondents are likewise liable as an aider and abettor of's securities law violations. Respondents substantially assisted in the wrongdoing through either overt acts, omissions, or through their failure to supervise the agents and employees under their supervision or third-parties whom they were contractually obligated to to supervise for the notcholders as third party beneficiaries.

### 11. Failure to Supervise

35. Respondents were negligent in failing to maintain and enforce a proper system of supervision and internal control over the brokers under their tutelage. Such negligence and/or gross negligence proximately caused damages to Claimants, for which Claimants now seek to recover.

### 12. Agency Liability - Express & Apparent Authority

36. During the time of the acts of Respondents and its agents that harmed Claimants, Respondents and its agent had actual and apparent authority to represent the other. The performance of any and all such acts by Respondents and its agents caused damages to Claimants. Accordingly, under governing agency-law, they are all liable for each other's misconduct.

### 13. Unjust Enrichment

37. Through their wrongful acts and self-dealing, Respondents were unjustly enriched by their receipt of profits, commissions, mark-ups, mark-downs, fees and/or spreads, funds received in connection with their duties

### 14. Promissory Estoppel, Detrimental Reliance, Waiver and Ratification

38. The private placement memorandums associated with the fifteen different privately placed limited partnerships identified the specific obligations and contractual duties owed by the Respondents to the note holders.

39. Claimants detrimentally relied upon respondents to act in their best interest and in accordance with the contractually duties enumerated in the various private placement memorandums. Accordingly, respondents are promissorily estopped from contesting

controlled their employees. Accordingly, each Respondents is liable jointly and severally to Claimants for the losses created by their wrongful conduct of Respondents agent employees.

**10.** **Aiding and Abetting Liability**

34. Respondents are liable as aiders and abettors of their agent-employee's law violations, pursuant to Tex. Rev. Civ. Stat. Ann. Art. 581-33(F)(2) and common nonfeasance, malfeasance and misfeasance. Respondents are likewise liable as an aider and abettor of's securities law violations. Respondents substantially assisted in the wrongdoing through either overt acts, omissions, or through their failure to supervise the agents and employees under their supervision or third-parties whom they were contractually obligated to to supervise for the noteholders as third party beneficiaries.

**11.** **Failure to Supervise**

35. Respondents were negligent in failing to maintain and enforce a proper system of supervision and internal control over the brokers under their tutelage. Such negligence and/or gross negligence proximately caused damages to Claimants, for which Claimants now seek to recover.

**12.** **Agency Liability - Express & Apparent Authority**

36. During the time of the acts of Respondents and its agents that harmed Claimants, Respondents and its agent had actual and apparent authority to represent the other. The performance of any and all such acts by Respondents and its agents caused damages to Claimants. Accordingly, under governing agency-law, they are all liable for each other's misconduct.

**13.** **Unjust Enrichment**

37. Through their wrongful acts and self-dealing, Respondents were unjustly enriched by their receipt of profits, commissions, mark-ups, mark-downs, fees and/or spreads, funds received in connection with their duties

**14.** **Promissory Estoppel, Detrimental Reliance, Waiver and Ratification**

38. The private placement memorandums associated with the fifteen different privately placed limited partnerships identified the specific obligations and contractual duties owed by the Respondents to the note holders.

39. Claimants detrimentally relied upon respondents to act in their best interest and in accordance with the contractually duties enumerated in the various private placement memorandums. Accordingly, respondents are promissorily estopped from contesting

Statement of Claim                                                      Page 15

otherwise; have waived their rights to deny their duty and through fraudulent concealment have ratified their misconduct.

## VI.

## DEMAND FOR RELIEF

40.    Based upon the foregoing, Claimants demand judgment against the Respondents as follows:

### A.  Actual Damages

41.    As a result of Respondents' conduct, Claimants suffered an economic loss of approximately $10,000,000.00 which represented more than half their investment.

### B.    Additional Damages

#### i.    Punitive Damages

42.    Claimants seeks punitive damages in an amount of at least three times his actual damages.  Punitive damages are compensation in excess of the actual loss suffered and are awarded as a form of punishment against the offending party.

43.    In 1989, the rules of the NYSE, the AMEX and NASD were revised to state that member organizations could not use pre-dispute arbitration agreements that limit the ability of arbitrators to make any award. For example, Rule 21 (f) (4), of the NASD Rules of Fair Practice provides: "No agreement [between a member and a customer] shall include any condition which . . . Limits the ability of the arbitrator's to make any award."

44.    The Securities and Exchange Commission approved these revised rules and construed them to prohibit brokers from attempting to limit a customer's right to seek and an arbitrator's right to award, punitive damages.

45.    On March 6, 1995, in Mastobuono v. Shearson Lehman Hutton, Inc., 115 S. Ct. 1212 the United States Supreme Court upheld an arbitration panel's power to award punitive damages under a brokerage account arbitration agreement that contains a New York choice of law provision. [New York law prohibits an award of punitive damages in arbitration]

46.    On March 22, 1995, the NASD issued a notice to members stating that customer agreements that prevent punitive damages violate Rule 21 (f) (4). Specifically, the Notice provides:

Statement of Claim                                                        Page 16

47.     Some customer agreements attempt to directly limit the ability of a customer to file a claim or to limit the authority of the arbitrators to make an award, including an award of punitive damages. Others attempt to do so indirectly by the use of a so-called "governing law clause For example, certain customer agreements simply state New York law will govern any dispute in arbitration, but do not disclose that New York law prohibits an award of punitive damages in arbitration. While the governing law clause is used to limit an award, it violates section 21 (f) of the NASD Rules of Fair Practice.

48.     Additionally, the Arbitrators Manual provided by the Securities Industry Conference on Arbitration ("SICA") allows for the award of punitive damages.

49.     The issue of punitive damages may arise with great frequency in arbitration. Parties to arbitrations are informed that arbitrators can consider punitive damages as a remedy. [See Claimants' Brief on the Applicability of Punitive Damages]

50.     Clearly and incontrovertibly, the United States Supreme Court, the Securities and Exchange Commission, the National Association of Securities Dealers, and the Securities Industry Conference on Arbitration all empower arbitration panels to award punitive damages. The specific grounds justifying an award of punitive damages are present where the fraud was gross or wanton, involving acts or omissions that evidence reckless and callous disregard or indifference to a customers rights. Respondents' deplorable treatment of Claimants satisfies this standard and therefore warrants imposition of punitive damages.

ii.     **Treble Damages**

51.     A less controversial form of additional damages is the trebling of damages under DTPA. The DTPA requires that damages be trebled if the DTPA violations are found to have been committed knowingly recklessly.

C.     **Attorneys' Fees**

52.     As a direct and proximate result of the wrongful conduct of Respondents as described above, Claimants has been compelled to retain the undersigned counsel to protect their rights, and to pay him a reasonable fee for his services, which Claimants seek to recover herein pursuant to Section 38.001 of the Tex. Civ. Prac. & Rem. Code, the Tex. Bus. & Comm. Code Section 27.01, the DTPA, and other applicable law.

Statement of Claim

**D.**      <u>Interest</u>

    53.      Claimants request the Panel award them pre-judgment and post-judgment interest at the maximum rate allowed by law.

**E.**      <u>Costs & Fees</u>

    .54.      Claimants requests that the Panel award them their costs and expenses of pursuing this arbitration claim, including expert witness fees, filing fees and hearing session deposits.

**F.**      <u>Tax offset</u>

    55.      If Claimants recovers their economic losses, they may be faced with a tax liability that they would otherwise not have incurred. For Claimants to be made whole, they are entitled to an additional recovery to offset this tax liability.

## VIII

## <u>SITE FOR ARBITRATION</u>

    56.      Pursuant to contract, Claimants hereby request a ten-day arbitration hearing before a full three person Panel.

Respectfully submitted,

THE LAW OFFICE OF JAMES R. MARLEN
BY:

James R. Marlen
Texas Bar No. 00794915
District of Columbia Bar No. 458330
3000 Carlisle Avenue, Suite 102
Dallas, Texas 75204
(214) 953-3100 Telephone
(214) 953-3190 Telecopier

ATTORNEY FOR CLAIMANTS

DOCKETED

AUG 1 1 2003

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

JUDGE RONALD GUZMAN

**03C 5531**

# Civil Cover Sheet

**MAGISTRATE JUDGE NOLAN**

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

| | |
|---|---|
| **Plaintiff(s):** Liberty Insurance Underwriters, Inc. | **Defendant(s):** Robert S. Ross and The Sterling Trust Company |
| County of Residence: New York, New York | County of Residence: Cook County, Illinois |
| Plaintiff's Atty: Terry D. Weissman Neal, Gerber & Eisenberg LLP Two N. LaSalle St., Chicago, IL 60602 312.269.8000 | Defendant's Atty: Michael E. Fox Fox, Hefter, Swibel, Levin & Carroll 325 N. LaSalle St., Suite 625, Chicago, IL 60610 312.224.1201 |

II. Basis of Jurisdiction:        **4. Diversity (complete item III)**

III. Citizenship of Principal
Parties (Diversity Cases Only)
        Plaintiff:-**5 Non IL corp and Principal place of Business outside IL**
        Defendant:-**1 Citizen of This State**

IV. Origin :        **1. Original Proceeding**

V. Nature of Suit:        **110 Insurance**

VI.Cause of Action:        **Declaratory judgment action regarding a professional liability insurance policy. Jurisdiction is based on diversity pursuant to 28 U.S.C. 1332(a).**

VII. Requested in Complaint
        Class Action:No
        Dollar Demand:
        Jury Demand:No

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date: _8/7/03_

JUDGE RONALD GUZMAN

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of

Liberty Insurance Underwriters, Inc.

v.

Robert S. Ross and The Sterling Trust Company

EASTERN DIVISION

**DOCKETED**

AUG 1 1 2003

**03C 5531**

Case Number: MAGISTRATE JUDGE NOLAN

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Liberty Insurance Underwriters, Inc.

FILED - EDA
U.S. DISTRICT CLERK
8 PM 11:30

| (A) | | | | (B) | | | |
|---|---|---|---|---|---|---|---|
| SIGNATURE | | | | SIGNATURE | | | |
| NAME Terry D. Weissman | | | | NAME Christopher D. Mickus | | | |
| FIRM Neal, Gerber & Eisenberg LLP | | | | FIRM Neal, Gerber & Eisenberg LLP | | | |
| STREET ADDRESS Two N. LaSalle Street | | | | STREET ADDRESS Two N. LaSalle Street | | | |
| CITY/STATE/ZIP Chicago, IL 60602 | | | | CITY/STATE/ZIP Chicago, IL 60602 | | | |
| TELEPHONE NUMBER 312.269.8000 | | FAX NUMBER 312.269.1747 | | TELEPHONE NUMBER 312.269.8000 | | FAX NUMBER 312.269.1747 | |
| E-MAIL ADDRESS tweissman@ngelaw.com | | | | E-MAIL ADDRESS cmickus@ngelaw.com | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6211582 | | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6270275 | | | |
| MEMBER OF TRIAL BAR? | YES ☑ | NO ☐ | | MEMBER OF TRIAL BAR? | YES ☐ | NO ☑ | |
| TRIAL ATTORNEY? | YES ☑ | NO ☐ | | TRIAL ATTORNEY? | YES ☐ | NO ☑ | |
| | | | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☑ | |
| (C) | | | | (D) | | | |
| SIGNATURE | | | | SIGNATURE | | | |
| NAME | | | | NAME | | | |
| FIRM | | | | FIRM | | | |
| STREET ADDRESS | | | | STREET ADDRESS | | | |
| CITY/STATE/ZIP | | | | CITY/STATE/ZIP | | | |
| TELEPHONE NUMBER | | FAX NUMBER | | TELEPHONE NUMBER | | FAX NUMBER | |
| E-MAIL ADDRESS | | | | E-MAIL ADDRESS | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | | MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | |
| TRIAL ATTORNEY? | YES ☐ | NO ☐ | | TRIAL ATTORNEY? | YES ☐ | NO ☐ | |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | |